**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Criminal No. 10-204 |
| | ) | Judge Nora Barry Fischer |
| PAUL PERMINTER, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is a motion to suppress evidence filed by Defendant Paul Perminter, Jr. ("Defendant") on May 26, 2011. (Docket No. 30). The Government opposes said motion. (Docket No. 33). Pre-hearing briefs were submitted by both parties and a suppression hearing was held on October 12, 2011. (Docket Nos. 30, 33, 34). The transcript of said hearing has been produced and fully considered by the Court. (Docket No. 55). The Court also ordered the parties to submit proposed findings of fact and conclusions of law and responses to same. (Docket No. 49). Defendant filed his proposed findings of fact and conclusions of law on December 14, 2011, (Docket No. 56), but the Government has not made any further submissions, despite the Court's Order.

Upon consideration of the parties' submissions, the evidence presented during the motion hearing and for the following reasons, the Court finds that the challenged evidence was obtained in violation of the Fourth Amendment. Accordingly, Defendant's motion to suppress [30] is granted.

### II. BACKGROUND

#### a. Findings of Fact

The credible evidence offered at the October 12, 2011 suppression hearing, including the

testimony of Probation Officer William Kimmel[1] and the presented documentary evidence, established the following facts.  (*See* Docket Nos. 30-2, 55, 50-1, 50-2, 50-3, 50-4, 50-5, 50-6).

Defendant is charged by way of indictment with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) arising from his possession of a Glock, Model 27, .40 caliber pistol on June 18, 2009 and a number of prior convictions for drug trafficking offenses.  (Docket No. 1).  The indictment alleges that Defendant was previously convicted of possession with intent to deliver controlled substances in the Court of Common Pleas, Beaver County, in two cases on September 25, 2001 and another two cases on May 2, 2005.  (*Id.*).  His rap sheet also includes: federal charges of possession with intent to deliver cocaine in 1989; state charges of receiving stolen property in 1989; distribution of cocaine while armed in 1992; misdemeanor conviction for violation of Pennsylvania drug statutes in 1992; and violations of the Pennsylvania drug statutes in 1996.  (Docket No. 55 at 20).  In addition, Defendant was shot and injured during a drug-related gun battle, leaving him partially paralyzed and confined to a wheelchair.  (*Id.* at 17-9).

After serving a sentence of two (2) to four (4) years' incarceration, Defendant was paroled from state custody on February 13, 2008.  (*Id.* at 50; Docket No. 50-2, Def. Ex. G).  Defendant's parole "maxed out" or was scheduled to end on June 21, 2009.  (Docket No. 50-5, Def. Ex. M; Docket No. 55 at 18).  Defendant was subject to strict conditions while on parole.  (Docket No. 30-2).  Among these conditions, he agreed to: comply with all municipal, county, state and federal laws; abstain from unlawful possession or sale of narcotics, dangerous drugs,

---

[1] It is well-settled that at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge."  *United States v. Hill*, Cr. No. 07-371, 2008 WL 2367185, *5 (W.D. Pa. 2008) (quoting *United States v. Richardson*, 501 F.Supp.2d 724, 734 (W.D.Pa.2007) (citations omitted))).  In this case, the Court found Kimmel's testimony to be generally credible.  However, as is further explained below, the Court discounted his testimony on several key points given the vagueness of his testimony and his inability to recall certain details.

controlled substances and drug paraphernalia; refrain from possession of firearms, ammunition or other weapons; maintain regular contact with parole supervision staff; submit to urinalysis testing; and achieve negative test results for the presence of controlled substances and other drugs. (*Id.*). In addition, Defendant expressly agreed to warrantless searches of his residence by parole supervision staff. (*Id.*). This condition states that:

> I expressly consent to the search of my person, property, and residence without a warrant by agents of the Pennsylvania Board of Probation and Parole. Any items, the possession of which constitutes a violation of parole/reparole shall be subject to seizure, and may be used as evidence in the parole revocation process.

(Docket No. 30-2 at 1).

Defendant was supervised by parole officers in the Beaver Falls sub office of the Pennsylvania Board of Probation and Parole – the office which handles cases in the area of Defendant's approved residence. (Docket No. 55 at 15-7). Agent David Sedon was initially assigned to Defendant's case. (*Id.* at 17). Parole officer William Kimmel of that office began to supervise Defendant in early 2009. (*Id.* at 15-16). Kimmel testified that he has been a parole officer for sixteen and a half years. (*Id.* at 16). He spent the entirety of his career within the Pittsburgh district but had previously worked at the Pittsburgh and McKeesport offices before taking a position at the Beaver Falls office. (*Id.*). In this role, he typically handles around sixty (60) cases at a time. (*Id.* at 113-14).

Defendant's approved residence was a one bedroom, handicapped accessible apartment in a public housing development in Ambridge, Pennsylvania.[2] (*Id.* at 45-6, 61, 98). Kimmel described this as a "high crime, high drug activity area" and expressed some reservations to others about Defendant making his residence there given his criminal past. (*Id.* at 48). However,

---

[2] Defendant initially resided with his girlfriend in New Brighton upon his release on parole but moved to this apartment with approval of the Parole Office. (Docket No. 50-2).

despite these general concerns, Kimmel testified that he had never personally observed any illegal activity in the immediate area surrounding the residence during his supervision of Defendant. (*Id.* at 60).

Kimmel testified that the Defendant was fully compliant with his conditions of parole throughout the entire time he had supervised him. (*Id.* at 20, 32, 39, 82). Kimmel explained that he had nothing but routine contacts with Defendant throughout his supervision of him, including several nondescript visits to his approved residence. (*Id.* at 17, 20, 26, 50). Kimmel pointed out that he made an unannounced visit to Defendant's home on June 12, 2009 at approximately 1:15 p.m. (*Id.* at 80). Defendant was not home at that time. (*Id.*). But, Kimmel explained that Defendant was permitted to be outside of his residence during the day and the fact that he was not home at that time was not a violation of any condition of his parole. (*Id.*). Kimmel also attempted to contact Defendant by phone around this time but was unable to reach him. (*Id.* at 80-1). Again, this was not seen as a violation of any condition.[3] (*Id.* at 81). Kimmel further acknowledged that Defendant never tested positive for drug use, despite the fact that multiple drug tests were taken. (*Id.* at 49). In all, Kimmel admitted that between February 12, 2008 and June 17, 2009, his office had no information of any parole violations committed by the Defendant. (*Id.*). He expressly testified that at that time, his office had "[n]othing that we could act on. Nothing that was obviously evident to us." (*Id.*).

Then, at approximately 12:00 p.m. on Wednesday, June 17, 2009, Kimmel was leaving the office for his lunch break when a secretary at his office informed him that he had a telephone call regarding the Defendant. (*Id.* at 51). Kimmel delayed his lunch break and took the call.

---

[3]      These interactions are referred to more broadly in the Supervision History Report, which states that "in the last few weeks agent has been attempting to contact him at his approved residence to by phone and home contact, as his case was nearing his last max date of 6/21/09." (Docket No. 50-2, Def. Ex. G). The Court credits Kimmel's testimony, in which he admitted that it was a single unannounced visit to Defendant's residence and a single phone call, although he could not recall on what date the phone call was made. (Docket No. 55 at 80-1).

Kimmel testified that the caller requested confidentiality and respecting the caller's wishes he did not attempt to elicit such information. (*Id.* at 54). Indeed, the Government objected to any questioning of Kimmel regarding the identity of the caller, including the caller's gender, race or any other descriptive traits.[4] (*Id.* at 84). Thus, the caller was truly anonymous and remains anonymous. Kimmel further explained that the caller did not provide him with any reason he or she had for making the call and actually "evaded" answering why he or she was calling. (*Id.* at 54). It appears that he also did not retrieve any information about the caller from which he could follow-up at a later time. To this end, the telephone call was not recorded. (*Id.* at 56). It was also not "logged in" to a record book because the office does not log calls. (*Id.* at 92).

There are also no contemporaneous records of the conversation with the anonymous tipster. In this regard, Kimmel could not recall if he took any handwritten notes of the call but, upon reviewing his file, he was unable to find any such notes. (*Id.* at 52, 57, 88). Kimmel, therefore, explained that if he had taken any such notes, he had since destroyed them. (*Id.* at 86). The only records of the call which Kimmel maintained included his recitation of the events in two reports, a supervision summary report and a supplemental report. (*Id.* at 90-91; Def. Ex. G

---

[4]     Specifically, the following exchange took place during defense counsel's cross examination of Kimmel:

> Q And this person was a woman; correct?
> MR. BURKE: I'm going to object to any form of identification of the caller, Your Honor. He's indicated on direct that he didn't want to reveal the identity because he thought it was a risk to this person who was giving information. He saw it as a safety issue. So, even to identify the person as male or female,  would like to object to that, now. It's not really relevant who, the information that was given was providing the details of the call. Sex, race, any other description of the caller, I don't really think is important here, Judge.

> THE COURT: Ms. Sims.

> MS. SIMS: Well, it's Mr. Burke's burden to provide reasonable suspicion. So, if he doesn't want to put in any details about the caller, I'll have to defer to him.

> THE COURT: The witness's previous testimony stands.

(Docket No. 55 at 84).

& H).  Both of these reports were produced on June 30 or July 1, 2009, approximately two weeks after the search of Defendant's residence.  (*Id.*).

Kimmel generally testified regarding the content of the anonymous tip, admitting that his testimony was not "verbatim."  (*Id.* at 52).  At times during this portion of his testimony, Kimmel appeared to read directly from the supervision summary report and supplemental report.  (*Id.* at 52-56).  In this Court's estimation, Kimmel's testimony regarding the content of the tip was very vague and the details he provided shed little light on whether his testimony reflected the content of the tip which was actually made to him during the brief phone conversation on July 17, 2009 or if the description of the tip included in his reports was influenced by the outcome of the search and the contraband items which were actually found in Defendant's apartment.

As to the specifics, Kimmel told the Court that the anonymous caller advised him that he or she had been inside the Defendant's residence within the week prior to June 17, 2009 and that the Defendant "was selling crack cocaine and marijuana on a regular basis out of his apartment."  (*Id.* at 52, 95).  The caller stated that the marijuana was located in the kitchen along with a scale and the crack cocaine was in a bedroom dresser.  (*Id.* at 53).  The caller did not provide any information about the packaging of the narcotics but advised that there was a "substantial amount" of marijuana in the residence.  (*Id.* at 54).  Kimmel continued that the caller had told him that the Defendant kept a gun at all times either in his bedroom or in his wheelchair.  (*Id.* at 53).  The gun was described to him only as a black, automatic handgun, after some brief questioning by Kimmel elicited further information pertaining to the gun.  (*Id.* at 53-54).

Kimmel then testified that the caller "seemed" sincere because the caller was "adamant" about the fact that the Defendant had contraband at the residence.  (*Id.* at 55).  Kimmel did not

perceive any slurring of the caller's speech and, as a result, did not feel that the caller was under the influence or not of a "sane mind." (*Id.*). Kimmel testified that he asked the caller to repeat the allegations a second time while they remained on the phone and found no inconsistencies between the caller's first and second recitations of the allegations. (*Id.* at 55). Kimmel also stated that the "caller gave detailed information regarding the interior of the home" but, on cross examination, he admitted that those "details" consisted of only the locations of the various items of contraband in the apartment. (*Id.* at 53, 92).

Immediately subsequent to receiving the anonymous phone call, Kimmel took his lunch break. (*Id.* at 93). He then went for a walk. (*Id.*). He was gone from the office for about an hour. (*Id.*). When he returned, he contacted his supervisor, Bruce Fronk. (*Id.*). During their conversation, Kimmel advised Fronk regarding Defendant's background and criminal history and told him that he believed Defendant was in possession of a firearm and narcotics. (*Id.* at 56). Kimmel then requested permission from Fronk to execute a search of Defendant's residence. (*Id.* at 57). Fronk granted him permission to do so. (*Id.*). After receiving permission, Kimmel started planning the search. (*Id.*). He quickly determined that the search could be conducted the following morning, July 18, 2009. (*Id.*). He then enlisted fellow parole agents, Dave Sedon and Cory Bish, to assist. (*Id.* at 57). Kimmel next contacted Ambridge Police Officers, McQuaide and Kelch, and requested back up for the search given that drugs and/or firearms may be present at the residence. (*Id.*).

Kimmel did not conduct a further investigation to corroborate any of the information he was provided by the anonymous caller and did not ask anyone else to do so. (*Id.* at 95). Indeed, he testified that it would not be prudent to conduct a further investigation at that time. (*Id.*). Specifically,

> Q: You did not do any further investigation between receiving the anonymous call and calling Officer McQuaide to arrange to have Mr. Perminter's apartment searched; correct?
>
> A: Well, there was no further investigation to be prudent at that point or possible. So, no. There wouldn't have been further investigation done at that time.

(*Id.*).

On the morning of June 18, 2009, Parole Officers Kimmel, Bish, and Sedon drove to the Ambridge Police Station to meet Ambridge Police Officers McQuaide and Kelch. (*Id.* at 96). Prior to the parole officers' arrival, Officer McQuaide had independently secured a "master key" from the housing authority which would open the front door to Defendant's apartment. (*Id.* at 61, 96). However, none of the officers obtained a warrant to search the Defendant's apartment. After meeting at the Ambridge Police Station, the parole and police officers traveled to Defendant's residence together. (*Id.* at 96). Kimmel testified that he observed no activity outside of the apartment at that time. (*Id.* at 59-60). He explained that:

> There was no activity. There was no one on the sidewalk. Couldn't hear any noise, any t.v.'s. et cetera. No traffic in the area. It was 8:19 a.m. in the morning. It was clear, sunny. There was [sic] no adverse weather conditions. Nothing. No nothing of note outside the residence.

(*Id.* at 60).

The group approached the door of Defendant's residence at approximately 8:19 a.m. (*Id.* at 60-61). They knocked several times and announced their presence by shouting "State Parole. Open the Door." (*Id.* at 61, 97). They heard no answer from anyone inside. (*Id.*). After approximately one minute of knocking and announcing, they used the master key supplied by the Ambridge Police officers to unlock the door to the apartment. (*Id.* at 65, 97). The parole and police officers entered the apartment with guns drawn – Kimmel with handgun, while one of the

police officers provided cover with a shotgun.  (*Id.* at 98).

Kimmel entered the apartment first and headed to his right where Defendant's bedroom was located.  (*Id.* at 61, 97).  He and the other officers continued shouting commands to Defendant as they entered.  Kimmel saw a female[5] sitting on Defendant's bed and then observed Defendant getting into his wheelchair.  (*Id.* at 62-63, 98).  Kimmel pointed his firearm at the Defendant and commanded him to put his hands up and freeze.  (*Id.* at 99).  Defendant acquiesced and Kimmel quickly acted to handcuff both of the Defendant's arms to his wheelchair to immobilize him.  (*Id.* at 64-65, 67).  Kimmel searched the Defendant's person and his wheelchair but did not find any contraband.  (*Id.*).

The officers next searched the entirety of Defendant's apartment, finding contraband in several locations.  (*Id.* at 67-69).  Within Defendant's bedroom, the Officers found: a large Ziplock bag containing marijuana in a drawer under the Defendant's bed; a .40 caliber Glock handgun under the Defendant's dresser; $377 on top of the dresser; nineteen separately wrapped pieces of crack cocaine and a digital scale in the dresser drawers; and a cell phone. (*Id.* at 67-69). In the kitchen, the officers uncovered: another cell phone; a second digital scale; a smaller amount of marijuana; and six boxes of Glad sandwich bags.  (*Id.* at 68).  The officers also seized a half-smoked cigar blunt containing suspected marijuana in a garbage can and a marijuana joint in a jacket sitting in plain view in the living room.  (*Id.* at 69).  Kimmel testified that the Ambridge Police Officers inventoried and seized the evidence to establish a chain of custody. (*Id.* at 67-68).  Kimmel explained that the suspected narcotics were lab tested and the unofficial results of the testing showed that the marijuana weighed ninety-nine (99) grams and the crack cocaine weighed seven (7) grams.  (*Id.* at 69).

---

[5]     The female was also secured, but she was not arrested nor charged with any offense arising from the challenged search.

After he was arrested, Defendant made several incriminating statements to Kimmel, although Kimmel testified that he did not give Defendant his Miranda warnings prior to their discussion and he did not hear any of the other officers give him such warnings. (*Id.* at 71). Kimmel explained that he initiated the conversation, telling the Defendant, "you know, obviously, we have some problems. There [are] illegal items here. And if you have something you want to speak with the officers about, they're probably going to want to interview you here." (*Id.* at 69-70). Defendant responded by stating that he did not want to make any statements at that time. (*Id.* at 70). However, later, when they were transporting the Defendant to jail, he said "everything in there is mine. It's not my girl's. Not the [ … ] girl's in the apartment." (*Id.*). Defendant also made statements to the effect of "I'll do the time…. I know the deal… I don't rat on people." (*Id.*). He then said "I'm f'd" a few times. (*Id.*).

### b. Relevant Procedural History

On October 19, 2010, a federal grand jury returned the instant indictment against the Defendant, charging him with violating 18 U.S.C. §§ 922(g)(1) and 924(e). (Docket No. 1). The penalties he faces include a term of imprisonment of not more than ten (10) years, however, if section 924(e) applies, he faces a mandatory minimum sentence of imprisonment of not less than fifteen (15) years. (Docket No. 2). Defendant then filed several motions for extensions of time to file pretrial motions, which the Court granted, extending the period of time for the filing of pretrial motions to May 26, 2011. (Docket Nos. 17, 18, 19, 20, 25, 26).

Defendant filed his motion to suppress evidence and a motion for discovery on May 26, 2011. (Docket No. 30). The Local Criminal Rules require the Government to file its response to such pretrial motions within fourteen (14) days. W.D.Pa. LCrR 12(C). The Government did not timely file its response by June 9, 2011. Instead, the Assistant U.S. Attorney filed *a nunc pro*

*tunc* motion on June 13, 2011 requesting additional time to respond given other pressing litigation matters. (Docket No. 31). The Court granted said motion, making the Government's response due by June 24, 2011. (Docket No. 32). This time, the Government filed its omnibus response to the pretrial motions by the extended deadline. (Docket No. 33). Defendant responded by filing a reply brief on June 28, 2011. (Docket No. 34).

The Court initially set a suppression hearing for July 6, 2011. (Docket No. 36). After a number of continuances were granted, the Court held a suppression hearing on October 12, 2011. (Docket No. 55). At the conclusion of the hearing, the Court ordered that the transcript of the proceeding be produced by November 14, 2011 and that that the parties submit proposed findings of fact and conclusions of law by December 14, 2011 and any responses to same by January 17, 2012. (Docket No. 49). Defendant filed his proposed findings of fact and conclusions of law on December 14, 2011. (Docket No. 56). The Government, however, did not file proposed findings of fact and conclusions of law by the December deadline nor any response to Defendant's proposed findings of fact and conclusions of law by the January deadline.[6] As a consequence, this Court took the matter under advisement as of January 18, 2012.

---

[6] The Government's failure to follow this Court's Order and file proposed findings of fact and conclusions or any response by the stated deadlines was not unexpected by the Court. Indeed, the Assistant United States Attorney assigned to this case was involved in several similar missteps throughout this litigation. For example, the Government missed the initial deadline to file responses to Defendant's pretrial motions by June 9, 2011, forcing counsel to seek *nunc pro tunc* relief from the Court's deadline. (Docket Nos. 31, 32, 33). Later, a telephone conference with counsel was necessary on October 5, 2011 because the United States Marshal's Office contacted the Court's staff to advise that an appropriate writ of habeas corpus *ad prosequendum* had yet to be obtained by the United States Attorney's Office to secure Defendant's presence at the motion hearing. (Docket No. 46). As the Court expressed during said conference, it is expected that the United States Attorney's Office handle such matters without being prompted by the Court. (*Id.*). The Court also granted the Defendant's motion for discovery and ordered the Government to produce the Defendant's parole supervision to him one week prior to the motion hearing. (Docket No. 43). The Government produced some documents to the defense in accord with this Order, but the Government's witness arrived to testify with additional documents which were not produced. (Docket No. 55 at 33-42). The Court was then forced to take a break in testimony to permit the Government to produce the documents to the defense during the hearing on October 12, 2011. (Docket No. 55 at 42). The Court's staff was also used to make additional copies of the documents in an effort to save time which was lost by the Government's inaction. (*Id.*). Finally, no motion to enlarge the time for the filing of proposed findings of fact and conclusions of law or responses to same has been filed by the Government.

The Court now turns to its analysis of Defendant's Motion.

III. DISCUSSION

At the outset, the Court finds that Defendant has met his initial burden to establish a colorable basis for the instant motion to suppress evidence because it is undisputed that the officers executed a warrantless search of Defendant's residence, potentially implicating his Fourth Amendment rights to be free from such warrantless searches. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted) ("once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable."). Therefore, the burden shifts to the Government to show that the search was reasonable and consistent with applicable Fourth Amendment jurisprudence. *Id.*

The Fourth Amendment provides, in pertinent part, that people have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. Generally, the Fourth Amendment mandates that government officials must establish probable cause and obtain a warrant prior to conducting a search or seizure. *Id.* ("no Warrants shall issue, but upon probable cause."). One well-established exception to the warrant requirement is the parole/probation exception. The Supreme Court has recognized that individuals who are released on probation "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). The United States Court of Appeals for the Third Circuit has extended the reasoning of *Griffin* to parolees. *See United States v. Hill*, 967 F.2d 902, 909 (3d Cir. 1992) (holding that "*Griffin's* reasoning applies equally to the parole system"). In the cases

brought against parolees or probationers, "the requisite level of suspicion is reduced and a warrant is not required" if "reasonable suspicion" exists to conduct a warrantless search or seizure. *United States v. Baker*, 221 F.3d 438, 443-44 (3d Cir. 2000). The Court of Appeals has explained that the reasonable suspicion standard is a:

> less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). The Court of Appeals has also recognized that the reasonable suspicion standard is applied in cases such as this one wherein the Defendant voluntarily executes the standard Pennsylvania consent form, authorizing warrantless searches of his approved residence by parole officers. *See Baker*, 221 F.3d at 448 ("we conclude that Pennsylvania would construe the consent form to include an implicit requirement that any search be based on reasonable suspicion.").

This Court must look at the "totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). This type of determination permits "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (citing *Cortez*, 449 U.S. at 418). Thus, the burden is on the Government to prove that Officer Kimmel had reasonable suspicion that Defendant had engaged in criminal conduct or committed a parole violation prior to executing the warrantless search of his apartment. *See Johnson*, 63 F.3d 242 at

245 (citation omitted). If the Government does not establish reasonable suspicion for the search, the search is illegal and any evidence obtained by law enforcement as a result of the unlawful search must be suppressed as the "fruit of the poisonous tree."[7] *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006); *see also Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (citation omitted).

In this case, Defendant argues that the Government has failed to meet its burden to show that the officers possessed reasonable suspicion of any criminal activity or parole violation prior to executing the search of his apartment. (Docket No. 56). Defendant maintains that Kimmel and the other officers acted pursuant to information obtained from an unidentified individual's unsolicited telephone call to Kimmel and made no effort to corroborate any of the information he obtained prior to executing the search. (*Id.*). Defendant claims that this "anonymous tip" is not sufficient to justify the search and, thus, seeks to suppress the evidence seized from his apartment and the subsequent statements he made to law enforcement. (*Id.*). In response, the Government maintains that it has met its evidentiary burden to demonstrate that the officers had reasonable suspicion to believe that the Defendant possessed a firearm and narcotics in violation of the conditions of his parole. (Docket No. 40). The Government focuses its arguments on Kimmel's awareness of the Defendant's prior criminal history, the specificity of the information provided by the anonymous informant and the accuracy of the information as exhibited by the results of the search and seizure of contraband from Defendant's apartment.[8] (*Id.*).

---

[7]      However, the Supreme Court has held that the "the federal exclusionary rule does not bar the introduction at parole revocation hearings of evidence seized in violation of parolees' Fourth Amendment rights." *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 363 (1998).

[8]      The Government alternatively argues that the officers did not violate the "knock and announce rule" prior to entering Defendant's apartment. (Docket No. 33 at 28-31). However, as Defendant points out in his reply, he never argued that the "knock and announce rule" was violated in this case because that rule generally applies only when officers attempt to execute a warrant and the instant case involves a warrantless search. (Docket No. 34 at ¶¶ 20-21). Therefore, no further analysis of this argument is necessary.

Reasonable suspicion has been referred to as an "elusive concept." *Brown*, 448 F.3d at 246 (3d Cir. 2006) (quoting *Cortez*, 449 U.S. at 417-18). However, with respect to anonymous tips, the contours of the law have been well defined by a number of Supreme Court decisions and further defined by Third Circuit precedent. Principally, in *Florida v. J.L.*, 529 U.S. 266, (2000), the Supreme Court held that:

> Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, *see Adams v. Williams*, 407 U.S. 143, 146–147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," *Alabama v. White*, 496 U.S., at 329, 110 S.Ct. 2412. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Id.*, at 327, 110 S.Ct. 2412.

In addition, "'an informant's veracity, reliability, and basis of knowledge ... [are] highly relevant in determining the value of his report.'" *Brown*, 448 F.3d at 249 (quoting *White*, 496 U.S. at 328).

The Court's first inquiry is whether the caller was truly anonymous from Officer Kimmel's perspective. *United States v. Nelson*, 284 F.3d 472, 481-82 (3d Cir. 2002). The cases teach that the fact that the informant's name or identity is withheld from the officer is not dispositive. *United States v. Yeager*, 351 F.App'x 718, 720 (3d Cir. 2009); *Nelson*, 284 F.3d at 481-82. Instead, the Court must consider whether the officer obtained any information about the caller from which he could locate the informant and hold him or her responsible for providing fabricated information. *Nelson*, 284 F.3d at 482. Facts that may elucidate this analysis include disclosures of: telephone numbers; addresses; relationships of the caller to the accused; or the ability of another officer or witness to identify the informant. *Id.*

Here, the informant was truly anonymous as Officer Kimmel confirmed during his

testimony that he had not obtained the caller's identity or any other information from which he could identify the caller and hold this individual responsible for making a false report. (Docket No. 55 at 54, 56-7, 84, 88, 92; Def. Ex. G & H). To this end, Officer Kimmel testified that the caller was unknown to him and he did not obtain any contact information from this individual. (Docket No. 55 at 54). Instead, he agreed to honor the caller's request for confidentiality. (*Id.*). He did so to the extent that the Government refused to present evidence regarding the caller's age, race, gender or any other descriptive traits at the motion hearing. (*Id.* at 84).

The Government attempted to bolster the credibility of the tipster by eliciting testimony from Kimmel regarding his impressions of the caller during their brief, ten minute phone conversation. (*Id.* at 53, 55). But, because the caller was truly anonymous, Kimmel could not properly assess the caller's *reputation* for truthfulness and he acquired no other facts which would have enabled him to locate the caller and potentially hold the caller responsible for providing false information, if it later proved inaccurate. *See J.L.*, 529 U.S. at 270. The information Kimmel gleaned from the call was limited and not very helpful in analyzing the reliability of the allegations he or she made against the Defendant. Kimmel explained that the caller did not appear to be intoxicated or insane. (*Id.* at 55). He also felt that the caller "seemed sincere" and was able to repeat his or her allegations twice to him without inconsistencies during their short phone conversation. (*Id.*). In contrast, Kimmel candidly admitted that the caller "evaded" his questions regarding why the allegations were being made against Defendant, but he perceived that the caller had a problem with Defendant's alleged dealing of crack cocaine. (*Id.* at 54). In this Court's estimation, considering the totality of the circumstances, the information which was provided by the anonymous informant to Kimmel was of low value and reliability.

This determination does not end the Court's analysis, however, as reasonable suspicion

may be found if the contents of an anonymous tip are "suitably corroborated" by the investigative officers. *See White*, 496 U.S., at 327. Of course, "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* at 330; *see also Nelson*, 284 F.3d at 480 ("If, for example, a tip on its own carries few indicia of reliability, much corroborating information is necessary to determine reasonable suspicion."). Courts have recognized that anonymous tips which contain predictive information about the accused's future actions and are verified by law enforcement are most helpful to bolster "the veracity and reliability of the tip." *United States v. Ritter*, 416 F.3d 256, 272 (3d Cir. 2005); *see also United States v. Johnson*, 592 F.3d 442, 450 (3d Cir. 2010) (citing *White*, 496 U.S. at 329–31, 110 S.Ct. 2412) ("The reliability of an informant's tip can be enhanced further by independent police corroboration of the information provided.").

Here, the anonymous informant advised Kimmel that Defendant was routinely selling crack cocaine and marijuana out of his apartment and was in possession of a firearm. (Docket No. 55 at 52, 95). The caller further provided information regarding where these items and the other drug paraphernalia were located in the apartment. (*Id.* at 53-54). At the motion hearing, the parties contested the precise details of the information provided by the anonymous informant concerning where the alleged contraband was located within the residence. (Docket No. 55). As the Court discussed above, Kimmel's testimony regarding what this individual told him about the location of the drugs, gun and other items was not entirely clear and may have been influenced by the outcome of the search. In any event, the Court does not believe that the anonymous informant's ability to predict the location of the drugs within the apartment controls the outcome of this case.

In *J.L.*, the Supreme Court held that "[t]he reasonableness of official suspicion must be measured by what the officers knew *before* they conducted their search." *J.L.*, 529 U.S. at 271 (emphasis added). In so holding, the Supreme Court recognized that the fact that the anonymous tipster had alleged that the accused was carrying a firearm and the information was ultimately accurate could not be considered during the reasonable suspicion analysis.[9] *Id.* Therefore, *J.L.* instructs that the "predictive information" contained in an anonymous tip must contain facts that can be independently corroborated *before* the challenged search is conducted. To hold otherwise would undermine the principles of the Fourth Amendment by justifying a search with the unlawful fruits of same. *See Wong Sun*, 371 U.S. at 487-88. As a result, in this case, the reasonableness of the search cannot be upheld based on the supposed accuracy of the tip predicting the location of the drugs within Defendant's apartment, facts that could not have been corroborated before the officers entered and searched the residence. This is insufficient as a matter of law. *See J.L.*, 529 U.S. at 271.

With that said, the anonymous tip in this case was not completely without predictive information. Along with the supposed location of the drugs, the informant also told Kimmel about the routine nature of Defendant's drug sales, and a parole officer with significant experience like Kimmel could reasonably infer from that information that individuals were coming and going to and from Defendant's apartment with regularity. (Docket No. 55 at 52, 95). Accordingly, Kimmel and the other officers could have attempted to corroborate this aspect of the anonymous tip by staking out the area around his apartment or through the use of some other investigative techniques. They did not do so. Indeed, Kimmel's testimony concerning potential

---

[9]    In *J.L.*, the Supreme Court also held that an anonymous informant's allegation that an individual possessed a firearm did not change the contours of the reasonable suspicion analysis. *J.L.*, 529 U.S. at 272. The same is true here as the fact that the caller advised that Defendant was armed does not reduce the Government's burden to show that Kimmel possessed reasonable suspicion to search Defendant's apartment.

activity outside Defendant's apartment proves otherwise. In this regard, he testified that on the morning of the search:

> There was no activity. There was no one on the sidewalk. Couldn't hear any noise, any t.v.'s. et cetera. No traffic in the area. It was 8:19 a.m. in the morning. It was clear, sunny. There was [sic] no adverse weather conditions. Nothing. No nothing of note outside the residence.

(Docket No. 55 at 59-60). Despite not observing any activity around the apartment, the officers proceeded to knock on Defendant's door for approximately one minute, heard no response and entered using the master key to the building. (*Id.* at 59-61, 65).

Even if the officers had observed something outside the apartment which could have helped corroborate the tip, it would have been purely inadvertent. During his testimony, Kimmel candidly admitted that he and the other officers did not conduct any investigation and, thus, made no attempt to verify the contents of the tip prior to arriving at Defendant's residence for the purpose of executing the search. (*Id.* at 95). Kimmel did not believe that it was "prudent" or "possible" to do so; alluding to the fact that he had a very short time to act on the information which he had obtained at lunchtime on Wednesday, June 17, 2009 given Defendant's parole expired on Sunday, June 21, 2009. (*Id.*). Yet, Kimmel was able to quickly assemble a team consisting of five presumably well-trained law enforcement personnel on Wednesday afternoon, including: himself; two fellow parole officers; and two police officers. (*Id.* at 57, 93). Certainly, these individuals could have been engaged to secure a warrant and/or assist in some form of an investigation prior to the search and could have completed same before Defendant's parole expired – four days later.

The Government also maintains that the information Kimmel obtained during his supervision of Defendant, including his criminal history and his lack of recent interactions with

the parole office supports reasonable suspicion to search the apartment. (Docket No. 33). But, Kimmel himself observed no signs of suspicious behavior by Defendant. (Docket No. 55 at 17, 20, 26, 32, 39, 49-50, 82). Defendant was fully compliant with all of his parole conditions throughout his supervision. (*Id.*). He did not fail any drug tests and had no other violations over the full sixteen month period. (*Id.* at 49). The facts that Defendant was not present in his home on the single occasion Kimmel made an unannounced visit and did not return a phone call does not provide the Government much support. (*Id.* at 80-1). Neither act constituted a violation of any of the Defendant's parole conditions. (*See* Docket No. 30-2 at 1). And, the fact that Defendant was not in his apartment could actually be viewed as undermining the tip - that Defendant, who is confined to his wheelchair, was selling drugs out of his home. Therefore, Defendant's supervision history did not provide Kimmel with any specific facts or an objective basis to reasonably conclude that illegal activity was occurring in the apartment. *Cf. United States v. Baker*, 221 F.3d 438, 444-445 (2000) (finding that there was no justification to search the trunk of a car because "[t]he parole officers' actions were not based on 'specific facts' giving rise to suspicion that there would be some evidence of a further violation of parole in the trunk.").

Admittedly, Defendant has a lengthy criminal history and known involvement in drug dealing and prior possession of firearms. (Docket No. 1; Docket No. 55 at 17-20). However, he had paid his debt to society by serving his sentence of incarceration and was completely clear of any criminal wrongdoing for the sixteen (16) months after his release (from February 13, 2008 to June 17, 2009). He had no violations of any of the strict parole conditions to which he was subject and the parole office had no information it could act on as of June 17, 2009. (Docket No. 55 at 17, 20, 26, 32, 39, 49-50 82). In similar scenarios, courts have recognized that the mere

fact that a parolee has a criminal record is not, in and of itself, sufficient to bolster the reliability

of an anonymous tip to the level of establishing reasonable suspicion that criminal wrongdoing

has occurred. *See United States v. Dono*, Crim. No. 10-763, 2011 WL 941465, at *4 (E.D.Pa.

Mar. 17, 2011) ("[Defendant's] criminal history, however, provides no additional reason to

suspect that he would be in possession of a firearm… [because the defendant] had not had any

problems of any kind while on probation."). Likewise, generalized concerns about the potential

for recidivism in parolees have been rejected as insufficient to support reasonable suspicion. To

this end, the Court agrees with the position of the United States Court of Appeals for the Tenth

Circuit that:

> [p]resumably all parolees have criminal records, and if this were
> sufficient to warrant reasonable suspicion, there would effectively
> be no limits on the ability of law enforcement officers to conduct
> warrantless searches of parolees' homes.

*United States v. Freeman*, 479 F.3d 743, 749 (10th Cir. 2007). As is discussed above, our Court

of Appeals has recognized that even parolees who are subject to the standard Pennsylvania

condition waiving a right to warrantless searches may not be subject to such warrantless searches

absent reasonable suspicion. *See Baker*, 221 F.3d at 448. The anonymous tip which was acted

on in this case is simply not enough.

    The Court also finds that this case is distinguishable from the two decisions of the United

States Court of Appeals for the Third Circuit upon which the Government relies, *United States v.

Hill*, 967 F.2d 902 (3d Cir. 1992) and *United States v. Davilla*, 69 F.App'x 537 (3d Cir. 2003).

First, neither *Hill* nor *Davilla* involved an anonymous tip.[10] Second, the law enforcement

officers in both cases conducted investigations and obtained specific information of criminal

---

[10]    Likewise, the facts of *Griffin v. Wisconsin*, 483 U.S. 868 (1987) also did not involve an anonymous tip. There, the probation officers acted pursuant to information that obtained from a known and credible source, a police detective from the local police force. *Id* at 871. Thus, *Griffin* is also distinguishable.

wrongdoing that is simply not present in the instant matter. For instance, in *Hill*, the defendant's wife provided his parole officers with information that he had guns and drugs in their home. *Hill*, 967 F.2d at 907-08. The agents searched the home and recovered this contraband. *Id.* Mrs. Hill then advised the agents that the defendant also possessed guns and drugs in a store he operated. *Id.* Defendant challenged this second search, advancing a number of different theories. *Id.* The Court of Appeals affirmed the District Court's decision that a warrant was not required and that the second search was reasonable. *Id.* Likewise, in *Davilla*, parole officers had much more than reasonable suspicion to search the parolee's apartment as he had committed several violations of the conditions of his parole (including failing to report to a scheduled meeting; failing to abide by a curfew; and drinking alcohol) and he then fled the scene after he was arrested for such violations. *Davilla*, 69 F.App'x at 538. A subsequent search of the defendant's apartment by the parole agents was upheld as reasonable. *Id.* at 541. These decisions are markedly different from the instant case, where a search was conducted on the basis of a bare anonymous tip.

The Court agrees with the Defendant that this case is much more analogous to *United States v. Dono,* 2011 WL 941465. In *Dono*, like the present case, the parole officer conducted a search of a parolee's residence after receiving an anonymous tip through a police officer that the defendant possessed a weapon. *Id.* at *1-2. The parole agent reviewed the parolee's file and found that he had numerous prior convictions but no violations of the conditions of his parole. *Id.* at *2. After receiving approval from his supervisor, the parole officer conducted a warrantless search of the defendant's residence and seized an AK-47 rifle belonging to the parolee. *Id.* The Court found that the parole officer did not have reasonable suspicion to

conduct the search based solely the anonymous tip and suppressed the firearm.[11]  *Id.* at *3-4.  As this case is on all fours with *Dono*, it commands the same result, suppression of the seized evidence.

In sum, after fully considering all of the parties' arguments, the evidence of record, and the totality of the circumstances in this case, the Court finds that the evidence presented at the motion hearing is not sufficient to demonstrate that Officer Kimmel had reasonable suspicion to believe that Defendant had violated any parole conditions and/or committed any crimes prior to conducting the warrantless search of his apartment on June 18, 2009.  From this Court's view, Kimmel did not possess a "particularized and objective basis" that Defendant was engaged in any legal wrongdoing, *Arvizu*, 534 U.S. at 273, before conducting the search of Defendant's residence, *J.L.*, 529 U.S. at 271.  Like the officers in *J.L.* and *Dono*, Kimmel had only a bare anonymous tip and neither he nor any other law enforcement officer made any effort to corroborate the contents of same.  Such tip alone is not sufficient to establish reasonable suspicion.  *See Dono,* 2011 WL 941465, at *3-4; *see also J.L.*, 529 U.S. at 270 (quoting *White*, 496 U.S. at 329) (holding that an anonymous tip must be suitably corroborated in order to exhibit "sufficient indicia of reliability to provide reasonable suspicion" for a warrantless search).

Certainly, the anonymous call should have prompted further inquiry and investigation by the parole officers and quite likely the police.  But, parolees are not without Fourth Amendment rights and a federal prosecution cannot be founded on evidence obtained in violation of those rights.  *See Hill*, 967 F.2d at 909; *see also Baker*, 221 F.3d at 443-44.  In this Court's opinion, the Government did not meet its burden to demonstrate that the search was reasonable and thus did not infringe on the Defendant's Fourth Amendment rights.  Therefore, the Court finds that

---

[11]     The Court notes that the United States initially filed an appeal of this decision but voluntarily dismissed the appeal before any briefing was submitted before the United States Court of Appeals for the Third Circuit.  *See United States v. Dono*, Cr. No. 10-763, Docket Report (E.D.Pa.).

the search was unlawful and that the challenged evidence, including the firearm, drugs, paraphernalia and all of Defendant's statements, must be suppressed as fruits of the unlawful search. *See Brown*, 448 F.3d at 244 (3d Cir. 2006); *see also Wong Sun*, 371 U.S. at 487-88 (citation omitted).

IV. CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress [30] is GRANTED. An appropriate Order follows.

<u>s/Nora Barry Fischer</u>
Nora Barry Fischer
United States District Judge

Date: January 30, 2012

cc/ecf: All counsel of record

Paul Perminter Jr., c/o Marketa Sims AFPD